# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| John Bauman, Individually and on Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| RealPage, Inc, Thoma Bravo, L.P., Apartment Income REIT Corp, Park Towne Place Apartment Homes, Sterling Apartment Homes, Greystar Real Estate Partners LLC, Lincoln Property Company, Cushman & Wakefield, Inc., Asset Living, LLC, FPI Management, Inc., Apartment Management Consultants, LLC, RPM Living, LLC, BH Management Services, LLC, Winncompanies, LLC, Mid-America Apartment Communities, Inc., Alliance Residential Realty, LLC, Morgan Properties, LLC, Cortland Partners, LLC, Avenue5 Residential, LLC, Bozzuto Management Company, AvalonBay Communities, Inc., Highmark Residential, LLC, Equity Residential, Essex Property Trust, Inc., ZRS Management, LLC, Camden Property Trust, UDR, Inc., CONAM Management Corporation, Sares Regis Group Commercial, Inc., Mission Rock Residential, LLC, CWS Apartment Homes LLC, AMLI Management Company, Security Properties Inc., Thrive Communities Management, LLC, Morgan Group Inc., and Prometheus Real Estate Group, Inc. | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff, John Bauman ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint ("Complaint") against RealPage, Inc, Thoma Bravo, L.P., Apartment Income REIT Corp, Park Towne Place Apartment Homes, Sterling Apartment

1

Homes, Greystar Real Estate Partners LLC, Lincoln Property Company, Cushman & Wakefield, Inc., Asset Living, LLC, FPI Management, Inc., Apartment Management Consultants, LLC, RPM Living, LLC, BH Management Services, LLC, Winncompanies, LLC, Mid-America Apartment Communities, Inc., Alliance Residential Realty, LLC, Morgan Properties, LLC, Cortland Partners, LLC, Avenue5 Residential, LLC, Bozzuto Management Company, AvalonBay Communities, Inc., Highmark Residential, LLC, Equity Residential, Essex Property Trust, Inc., ZRS Management, LLC, Camden Property Trust, UDR, Inc., CONAM Management Corporation, Sares Regis Group Commercial, Inc., Mission Rock Residential, LLC, CWS Apartment Homes LLC, AMLI Management Company, Security Properties, Inc., Thrive Communities Management, LLC, Morgan Group Inc., and Prometheus Real Estate Group, Inc. (collectively "Defendants") and allege, upon personal knowledge as to his own actions and upon information and belief, including his counsels' investigations, as to all other matters, as follows:

## I.    NATURE AND SUMMARY OF THE ACTION

1.    Plaintiff, John Bauman, challenges a cartel among lessors of multifamily residential real estate leases to artificially inflate the prices of multifamily residential real estate in the United States above competitive levels.

2.    Defendant RealPage, Inc. ("RealPage"), provides property management software for the multifamily residential real estate industry.

3.    RealPage's software, Yieldstar, is a pricing algorithm that monitors real-time lease-transaction data, allowing landlords to set rental prices based on their competition's prices. Yieldstar calculates the 'yield management' of the residential real estate industry and recommends price adjustments in response to certain market conditions such as demand or competition.

2

4.     The head of RealPage's Yieldstar program, explained that pricing software was developed to eliminate "empathy" in pricing apartment units.[1]

5.     RealPage ensures that its property management clients understand that they must accept the algorithm's price to maximize their revenues. RealPage also induces its clients to artificially stress the rental market to improve rates. This has created a perpetually growing hub-and-spoke conspiracy, as more and more property managers use RealPage, the more likely it is that RealPage has violated antitrust law.

6.     Before the introduction of pricing software, leasing agents would price and lease out apartments manually based on their own gut instincts and industry insights. This has changed overnight with the widespread adoption of pricing software.

7.     Around 2016, the industry's use of pricing software began to achieve "critical mass." As more property managers began to use Yieldstar, the more data flowed into the company and affected its pricing algorithm.

8.     However, this was not the only way that RealPage grew its algorithm. In December 2017, RealPage acquired its biggest competitor Lease Rent Options, thereby gaining access to its client portfolio while at the same time shutting down competing pricing algorithms.

9.     RealPage continued a series of acquisitions, with the hopes of driving out competition and controlling more and more of the rental market, and as of October 7, 2022, RealPage maintains a portfolio of over 22 million units worldwide.

---

[1] Heather Vogell, *Rent Going Up? One Company's Algorithm Could Be Why*, ProPublica (Oct. 15, 2022). Available at: https://www.propublica.org/article/yieldstar-rent-increase-realpage-rent.

10. There is an estimated 65 million rental homes in the United States rental market and RealPage software is used in at least 30% of the market.[2]

11. RealPage claimed that its software would increase revenue and decrease vacancies and that using its Yieldstar software would eliminate the risk of collusion that could occur with manual pricing.[3] Ironically, Yieldstar appears to have done the exact opposite and provided a forum for leasing agents to collude and exchange competitive information in a much denser and faster manner than previously thought possible.

12. Former Acting Federal Trade Commissioner, Maureen K. Ohlhausen discussed the potential of illegal price fixing via pricing algorithms back in 2017.[4]

> Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either.
>
> If conduct was unlawful before, using an algorithm to effectuate it will not magically transform it into lawful behavior.
>
> Imagine a group of competitors sub-contracting their pricing decisions to a common, outside agent that provides algorithmic pricing services. Each firm communicates its pricing strategy to the vendor, and the vendor then programs its algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has confidential price strategy information from multiple competitors, it can program its algorithm to maximize industry-wide pricing. In effect, the firms themselves don't directly share their pricing strategies, but that information still ends up in common hands, and that shared information is then used to maximize market-wide prices.

---

[2] Fitch Assigns First-Time 'B' IDR to RealPage, Inc.; Outlook Stable (Feb. 11, 2021). Available at: https://www.fitchratings.com/research/corporate-finance/fitch-assigns-first-time-b-idr-to-RealPage-inc-outlook-stable-11-02-2021

[3] *See* Note 1, *supra*.

[4] Maureen K. Olhausen, Acting Chairman, U.S. Federal Trade Commission, *Should We Fear the Things That Go Beep In The Night? Some Initial Thoughts on the Intersection of Antitrust Law and Algorithmic Pricing*, United States of America Federal Trade Commission, (May 23, 2017). Available at: https://www.ftc.gov/system/files/documents/public_statements/1220893/ohlhausen_-_concurrences_5-23-17.pdf

4

13. Furthermore, at the same time that RealPage was increasing prices throughout the residential real estate pricing market, it was engaging in activities to artificially depress the supply of available units. During an earnings call in 2017, RealPage founder Steve Winn, discussed the profitability of raising rents while leaving some apartments vacant.[5] This strategy would only push rents higher, costing the average tenant while unlawfully enriching Defendants and co-conspirators.

14. As detailed below, Defendants constitute a price-fixing cartel, and the revenue growth they have achieved has been the result of coordinated price fixing.

15. Plaintiff by this action seeks compensatory damages to remediate Defendants' unlawful conduct in violation of the Sherman Act, and to provide damages as well as injunctive relief barring Defendants from using Yieldstar software, or any other form of rental pricing software, or for any other such relief.

## II. JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1131 and 1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

17. This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), Federal Rule of Civil Procedure 4(h)(1)(A), and the long-arm statute of Tennessee, T.C.A. § 20-225 *et seq.*

---

[5] *RealPage's (RP) CEO Steve Winn on Q4 2017 Results – Earnings Call Transcript*, SeekingAlpha (Feb. 27, 2018). Available at: https://seekingalpha.com/article/4151484-RealPages-rp-ceo-steve-winn-on-q4-2017-results-earnings-call-transcript

18.     Venue is proper in the Middle District of Tennessee pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and the federal venue statute (28 U.S.C. § 1391(b)(1) because at all relevant times, one or more of the Defendants resided, transacted business, was found, is licensed to do business, and/or had agents in this District.

19.     Venue is also proper pursuant to 28 U.S.C. § 1407, as the Judicial Panel on Multidistrict Litigation has determined that the Middle District of Tennessee is the most suitable venue for actions related to MDL No. 3071 – IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II).

20.     Venue is also proper pursuant to U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendants to establish minimal diversity.

### III.    PARTIES

21.     Plaintiff, John Bauman, is a citizen and resident of the State of Florida, currently residing in Fort Lauderdale.

22.     Defendant RealPage, Inc. is a Delaware corporation headquartered in Richardson, Texas.  RealPage was a public company from 2010 until December 2020, when it was purchased by private equity firm Thoma Bravo in a transaction that valued RealPage at approximately $10.2 billion.  RealPage provides software and services to the residential real estate industry, including the RMS described herein.  RealPage has thousands of employees and earns over a billion dollars per year in revenue.  As of December 31, 2019, RealPage had over 29,800 clients, including each of the ten largest multifamily property management companies.

6

23.     Defendant Thoma Bravo, L.P. ("Thoma Bravo") is a Delaware limited partnership with offices in this district in Miami, as well as in San Francisco, California, and Chicago, Illinois. Thoma Bravo is a private equity firm with over $122 billion in assets. Thoma Bravo acquired RealPage in April 2021. On information and belief, Thoma Bravo was aware of RealPage's anticompetitive activities and acquired RealPage with the intent to maintain and enhance its cartel profits, which RealPage, with Thoma Bravo's active guidance and participation, has done. Plaintiff is informed and believes that Thoma Bravo is actively involved in the day-to-day operations of RealPage, including selecting and approving acquisition targets for RealPage, setting company policies, and hiring top RealPage executives from other Thoma Bravo companies, including CEO Dana Jones and COO Vinit Doshi, both of whom were recruited from Thoma Bravo subsidiary Sparta Systems.

24.     Defendant Apartment Income REIT Corp., d/b/a Air Communities ("AIR"), is a publicly traded real estate investment trust headquartered in Denver, Colorado. Defendant AIR controls over 25,000 apartment homes, as well as earns hundreds of millions of dollars per year in revenue. On information and belief, Defendant AIR is the owner and/or operator of Defendants Park Towne Place and Sterling Apartment Homes. On information and belief, AIR is a client of RealPage.

25.     Defendant, Park Towne Place Apartment Homes ("Park Towne Place"), located at 2200 Benjamin Franklin Parkway, Philadelphia, PA 19130, is a multifamily residential building that uses RealPage software to price its apartment units. Plaintiff, John Bauman, is a former lessee of Defendants, Park Towne Place and AIR.

7

26.     Defendant, Sterling Apartment Homes ("Sterling"), located at 1815 John F Kennedy Blvd, Philadelphia, PA 19103, is a multifamily residential building that uses RealPage software to price its apartment units.

27.     Defendant Greystar Real Estate Partners, LLC ("Greystar") is a Delaware limited liability corporation headquartered in Charleston, South Carolina.  It is the largest manager of multifamily rental real estate in the United States, with more than 782,900 multifamily units and student beds under management nationally.  On information and belief, Greystar earns billions of dollars per year in revenue, controls $35.5 billion dollars in assets, and employs over 20,000 people. On information and belief, Greystar is a client of RealPage.

28.     Defendant Lincoln Property Company ("Lincoln") is a Texas corporation headquartered in Dallas, Texas.  Lincoln is the second largest manager of multifamily rental real estate in the United States, with over 210,000 multifamily units under management nationally. On information and belief, Lincoln earns billions of dollars per year in revenue and employs thousands of people. On information and belief, Lincoln is a client of RealPage.

29.     Defendant Cushman & Wakefield, Inc. ("C&W") is a New York corporation and headquartered in New York, New York. C&W is the third largest manager of multifamily rental real estate in the United States, with over 172,000 multifamily units under management nationally. On information and belief, C&W earns billions of dollars per year in revenue and employs over ten thousand people. On information and belief, C&W is a client of RealPage.

30.     Defendant Asset Living, LLC ("Asset Living") is an Arizona limited liability corporation headquartered in Houston, Texas. Asset Living is the fourth largest manager of multifamily rental real estate in the United States, managing more than 150,000 multifamily units across the country.  On information and belief, Asset Living is a client of RealPage.

8

31.     Defendant FPI Management, Inc. ("FPI") is a California corporation headquartered in Folsom, California.  FPI is the fifth largest manager of multifamily rental real estate in the United States, with over 150,000 multifamily units under management in 17 states.   On information and belief, FPI earns billions of dollars per year in revenue and employs thousands of people. On information and belief, FPI is a client of RealPage.

32.     Defendant Apartment Management Consultants, LLC ("AMC") is a Utah limited liability corporation headquartered in Sandy, Utah. AMC is the sixth largest manager of multifamily rental real estate in the United States, managing more than 110,000 units across the country. On information and belief, AMC is a RealPage client.

33.     Defendant RPM Living, LLC ("RPM") is a Texas limited liability company headquartered in Austin, Texas. RPM is the seventh largest manager of multifamily rental real estate in the United States, managing over 110,000 units across the country.  On information and belief, RPM earns hundreds of millions of dollars per year and employs hundreds of people. On information and belief, RPM is a client of RealPage.

34.     Defendant BH Management Services, LLC ("BH") is an Iowa limited liability company with its headquarters in Des Moines, Iowa. BH is the eighth largest manager of multifamily rental real estate in the United States, with over 100,000 multifamily units under management in 28 states. On information and belief, BH earns over one billion dollars per year in revenue and employs over 2,000 people. On information and belief, CH is a client of RealPage.

35.     Defendant Winncompanies LLC ("Winncompanies") is a Massachusetts company with its primary place of business located in Boston, Massachusetts. Winncompanies is the ninth largest manager of multifamily rental real estate in the United States, managing over 100,000 apartment units nationwide. On information and belief, Winncompanies is a client of RealPage.

9

36.     Defendant Mid-America Apartment Communities, Inc. ("MAA") is a Tennessee corporation headquartered in Germantown, Tennessee.  MAA is the tenth largest manager of multifamily rental real estate in the United States, with over 100,000 multifamily units under management in 16 states.  On information and belief, MAA earns over one billion dollars per year in revenue and employs over 2,400 people. On information and belief, MAA is a client of RealPage.

37.     Defendant Alliance Residential Realty, LLC ("Alliance") is a Delaware limited liability corporation headquartered in Scottsdale, Arizona. Alliance is one of the largest managers of multifamily rental real estate in the United States, managing over 100,000 apartment units across the country. On information and belief, Alliance is a client of RealPage.

38.     Defendant Morgan Properties, LLC ("Morgan") is a Pennsylvania limited liability company headquartered in King of Prussia, Pennsylvania.  Morgan is the one of the largest managers of multifamily rental real estate in the United States, managing over 90,000 units across the country. On information and belief, Morgan earns hundreds of millions of dollars per year in revenue and employs hundreds of employees.  On information and belief, Morgan is a client of RealPage.

39.     Defendant Cortland Partners, LLC ("Cortland") is a Georgia limited liability company headquartered in Atlanta, Georgia. Cortland is the one of the largest managers of multifamily residential real estate in the United States, managing over 85,000 units across the country. On information and belief, Cortland earns hundreds of millions of dollars in revenues per year and employs over 1,000 people. On information and belief, Cortland is a client of RealPage.

40.     Defendant Avenue5 Residential, LLC ("Avenue5") is a Delaware limited liability company headquartered in Seattle, Washington. Avenue5 is the one of the largest managers of

10

multifamily rental real estate in the United States, managing over 80,000 units across the country. On information and belief, Avenue5 earns over $500 million dollars per year in revenue and employs over 1,000 people. On information and belief, Avenue5 is a client of RealPage.

41.     Defendant Bozzuto Management Company ("Bozzuto") is a Maryland company headquartered in Greenbelt, Maryland. Bozzuto is the one of the largest managers of multifamily rental real estate in the United States, managing over 80,000 multifamily units across the country. On information and belief, Bozzuto earns over two billion dollars per year in revenue and employs over 3,000 people. On information and belief, Bozzuto is a client of RealPage.

42.     Defendant AvalonBay Communities, Inc. ("AvalonBay") is a Maryland corporation headquartered in Arlington, Virginia. AvalonBay is the one of the largest managers of multifamily rental real estate in the United States, managing over 80,000 units across the country. On information and belief, AvalonBay earns billions of dollars per year in revenue and employs thousands of people. On information and belief, AvalonBay is a client of RealPage.

43.     Defendant Highmark Residential, LLC ("Highmark") is a Delaware limited liability company headquartered in Dallas, Texas. Highmark is the one of the largest managers of multifamily rental real estate in the United States, managing over 79,000 units across the country. On information and belief, Highmark earns hundreds of millions of dollars per year in revenue and employs over 1,500 people. On information and belief, Highmark is a client of RealPage.

44.     Defendant Equity Residential ("Equity") is a Maryland real estate investment trust headquartered in Chicago, Illinois.  Equity is the one of the largest managers of multifamily rental real estate in the United States, managing over 80,000 units across the country.  On information and belief, Equity earns over 2 billion dollars per year in revenue and employs over 2,000 people. On information and belief, Equity is a client of RealPage.

11

45.     Defendant Essex Property Trust, Inc. ("Essex") is a Maryland corporation headquartered in San Mateo, California.  Equity is the one of the largest managers of multifamily rental real estate in the United States, managing over 61,000 units in California and Washington. On information and belief, Essex earns over 1.4 billion dollars per year in revenue and employs over 1,700 people. On information and belief, Essex is a client of RealPage.

46.     Defendant ZRS Management, LLC ("ZRS") is a Florida limited liability company headquartered in Orlando, Florida. ZRS is the one of the largest managers of multifamily rental real estate in the United States, managing over 60,000 units across the country. On information and belief, ZRS earns millions of dollars per year in revenue and employs hundreds of people. On information and belief, ZRS is a client of RealPage.

47.     Defendant Camden Property Trust ("Camden") is a Texas real estate trust headquartered in Houston, Texas. Camden is the one of the largest managers of rental real estate in the United States, managing over 58,000 units across the country. On information and belief, Camden earns over one billion dollars per year in revenue and employs over 1,000 people. On information and belief, Camden is a client of RealPage.

48.     Defendant UDR, Inc. ("UDR") is a Maryland corporation headquartered in Highlands Ranch, Colorado. UDR is the one of the largest managers of multifamily rental real estate in the United States, managing over 55,000 across the country. On information and belief, UDR earns over one billion dollars per year in revenue and employs over 1,000 people. On information and belief, UDR is a client of RealPage.

49.     Defendant CONAM Management Corporation ("CONAM") is a California corporation headquartered in San Diego, California. CONAM is the one of the largest managers of multifamily rental real estate in the United States, managing over 51,000 units across the

12

country. On information and belief, CONAM earns hundreds of millions of dollars per year in revenue and employs over 1,000 people. On information and belief, CONAM is a client of RealPage.

50.     Defendant Sares Regis Group Commercial, Inc. ("Sares Regis") is a California corporation headquartered in Newport Beach, California. Sares Regis is one of the largest managers of multifamily rental real estate in the United States, managing over 29,000 units across the country. On information and belief, Sares Regis earns millions of dollars in revenue per year and employs hundreds of people. On information and belief, Sara Regis is a client of RealPage.

51.     Defendant Mission Rock Residential, LLC ("Mission Rock") is a Delaware limited liability company headquartered in Denver, Colorado. Mission Rock is one of the largest managers of multifamily rental real estate in the United States, managing over 29,000 units under management across the country. On information and belief, Mission Rock earns tens of millions of dollars per year in revenue and employs over 700 people. On information and belief, Mission Rock is a client of RealPage.

52.     Defendant CWS Apartment Homes LLC ("CWS") is a Delaware limited liability company headquartered in Austin, Texas. CWS is one of the largest managers of multifamily rental real estate in the United States, managing over 29,000 units under management across the country. On information and belief, CWS earns millions of dollars per year in revenue and employs over 500 people. On information and belief, CWS is a client of RealPage.

53.     Defendant AMLI Management Company ("AMLI") is a Delaware corporation headquartered in Chicago, Illinois. AMLI is one of the largest managers of multifamily rental real estate in the United States, managing over 25,000 apartment units across the country. On information and belief, AMLI is a client of RealPage.

13

54.     Defendant Security Properties Inc. ("Security Properties") is a Washington corporation headquartered in Seattle, Washington.   Security Properties is one of the largest managers of multifamily rental real estate in the United States, managing over 22,000 units under management in 18 states.  On information and belief, Security Properties earns millions of dollars per year in revenue. On information and belief, Security Properties is a client of RealPage.

55.     Defendant Thrive Communities Management, LLC ("Thrive") is a Washington Limited Liability Company headquartered in Seattle, Washington. Thrive is one of the largest managers of multifamily rental real estate in the United States, managing over 18,000 units under management in the greater Pacific Northwest.  On information and belief, Thrive earns millions of dollars per year in revenue and employs over 500 people. On information and belief, Thrive is a client of RealPage.

56.     Defendant Morgan Group, Inc. ("Morgan") is a Delaware corporation headquartered in Houston, Texas.  Morgan is one of the largest managers of multifamily rental real estate in the United States, managing over 15,000 units under management across the country. On information and belief, Morgan earns millions of dollars per year in revenue and employs hundreds of employees. On information and belief, Morgan is a client of RealPage.

57.     Defendant Prometheus Real Estate Group, Inc. ("Prometheus") is a California corporation headquartered in San Mateo, California. Prometheus is one of the largest managers of multifamily rental real estate in the United States, managing 12,000 multifamily units under management in California, Oregon, and Washington. On information and belief, Prometheus earns millions of dollars per year in revenue and employs hundreds of people. On information and belief, Prometheus is a client of RealPage.

14

58.     Additional Co-Conspirators ("Unknown Defendant Co-Conspirators") are various persons and entities, including lessors and multifamily apartment management companies, known and unknown to Plaintiff and not named as defendants in this action, who have participated as co-conspirators with RealPage, Thoma Bravo, and the above Defendants in the offenses alleged and have performed acts and made statements in furtherance of the conspiracy.

## IV. FACTUAL ALLEGATIONS

### *The Market for Residential Real Estate Leases*

59.     The relevant product market at issue is the market for the lease of multifamily residential real estate and the relevant geographic market is the United States.

60.     From the perspective of the consumer, multifamily rental apartment units are not an economic substitute for traditional homes, such as condominiums or single-family homes, as the requirements to obtain such traditional housing are much higher.

61.     To purchase traditional housing such as condominiums or single-family homes, the average consumer must make a substantial initial payment and/or obtain financing. There is also substantial upkeep once traditional housing is obtained, including taxes, homeowner association fees, utility bills, maintenance and repair costs. In contrast, multifamily residential units also offer amenities and security, as well as lower ongoing costs.

62.     Accordingly, the multifamily residential real estate lease market satisfies the Small but Significant Non-Transitory Increase in Price ("SSNIP") Test.

63.     The SSNIP Test identifies the smallest relevant market within which a cartel could impose a small but significant increase in price (typically 5%) without its customers turning away. If the SSNIP is profitable, the market is properly defined. If the SSNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient economic substitutes.

15

64.     Here, the SSNIP test is satisfied and the market is properly defined.

65.     As described above and below, Defendants are able to increase prices "year over year", resulting in a consistent increase over 5% ever year. Yet despite the increases, renters have no substitute, and thus are forced to accept these increases.

### *RealPage's Acquisitions and Motivations*

66.     Yieldstar was developed by Defendant Camden, as a revenue management system in the early 2000's, when it was subsequently acquired by RealPage in 2002.

67.     With the announcement of its Yieldstar acquisition, RealPage revealed its key strategies and future plans with the algorithm.[6]

> Yieldstar is designed to help property owners optimize pricing of apartment inventory using sophisticated yield models that adjust apartment rents in real time to reflect imbalances in supply and demand.
>
> RealPage believes that active client participation is critically important to the development of world-class products, and the company is expanding the group of property owner/managers who preview the initial system by holding executive-level revenue management summits . . . to demonstrate the inner workings of the system. Input received from these summits will be factored into subsequent releases of the product. The summits will discuss eight elements of revenue management: 1) Competitive Rent Analysis; 2) Lease Management; 3) Supply Forecast; 4) Demand Forecast; Pricing Engine; Lease Term Price Adjustments; Renewal Price Adjustments; Renewal Price Adjustments.

68.     In 2004, RealPage acquired Re-Opt, a company focused on revenue optimization systems for the multifamily sector. Notably, Re-Opt was headed by Jeffrey Roper, a former airline executive.[7] Roper would head the Yieldstar division as part of the acquisition.

---

[6] *RealPage Acquires YieldStar Multifamily Revenue Management System*, RealPage (July 19, 2002). Available at: https://www.RealPage.com/news/RealPage-acquires-yieldstar-multifamily-revenue-management-system/
[7] *RealPage Expands M/PF Research Product Line With Acquisition Of RE-Opt*, RealPage (June 16, 2004). Available at: https://www.realpage.com/news/realpage-expands-mpf-research-product-line-with-acquisition-of-re-opt/

16

69.     Jeffrey Roper, was at the center of a similar antitrust scandal in the 1980s, when his company and other major airlines developed similar price-setting software. The federal government investigated the airlines for antitrust activity. It reached settlements with several airlines, all of which agreed to change how they used the technology. Reportedly, at one point federal agents removed a computer and documents from Roper's office.[8]

70.     Roper allegedly saw an opportunity to disrupt the housing rental industry in the United States, and began developing software to set prices for rental units based on an algorithm. He appears to have successfully replicated the same core idea that was prosecuted in the 1980's in the airline industry, but for the multifamily residential industry.

71.     By 2005, RealPage announced that Yieldstar had successfully produced positive results at Defendant Camden's properties.[9] The same Defendant that RealPage had acquired its algorithm from in 2002. After years of development, Yieldstar was finally ready to be launched.

72.     Since its initial acquisition of the Yieldstar software in 2002, and Re-Opt in 2004, RealPage has been engaged in an acquisition spree to increase its client portfolio.

73.     In December 2017, RealPage acquired its biggest competitor Lease Rent Options ("LRO"), thereby gaining access to its client portfolio while at the same time shutting down competing pricing algorithms.

---

[8] See Note 1, *supra*.
[9] *RealPage's YieldStar™ Revenue Management System Empowering On-site Staff, Managers at Camden,* RealPage (Sep. 12, 2005). Available at: https://www.realpage.com/news/realpages-yieldstaramptrade-revenue-management-system-empowering-on-site-staff-managers-at-camden/

17

74. In December 20, 2019, RealPage acquired one of its competitors, Buildium. Buildium offered a similar property management software program to approximately 2 million residential units.[10]

75. In October 7, 2022, RealPage acquired yet another competitor, Knock CRM.[11]

76. There is an estimated 65 million total multifamily residential units in the United States. [12]

77. As of October 7, 2022, RealPage maintains a portfolio of over 22 million multifamily residential units, or 30% of the national market.

### *Traditional Leasing Strategies and RealPage's Strategies*

78. Before RealPage facilitated collusion among property managers, leasing agents acting independently tried to maximize occupancy.

79. The traditional strategy for property managers, informally known as "keeping the heads in the bed", was to maximize residency through pro-consumer concessions such as gifts, promotional offers, giveaways, and rent waivers, etc.[13]

80. Additionally, some property managers would undercut the average market price in order to maintain their volume of tenants. These actions helped create a stable and competitive market for the average consumer, as well as minimize any vacancies. One executive at a

---

[10] Julia Falcon, *RealPage buys Buildium for $580* million, Housingwire (Dec. 20, 2019). Available at: https://www.housingwire.com/articles/RealPage-buys-buildium-for-580-million/
[11] *RealPage Announces Definitive Agreement to Acquire Knock CRM*, RealPage (Sep. 30, 2022). Available at: https://www.RealPage.com/news/knock-acquisition/
[12] *See* Note 2, *supra.*
[13] Joe Bousquin, *In the Back Office, Revenue Management Software is Causing a* Revolution, Multifamily Executive, (April 20, 2009). Available at: https://www.multifamilyexecutive.com/technology/in-the-back-office-revenue-management-software-is-causing-a-revolution_o

18

development company stated, "We learned that if you were not 95 percent-plus occupied, the asset was failing."[14]

81.     The introduction of pricing software upheaved these beliefs.

82.     According to Roper, leasing agents would be 'too empathetic' in pricing available units, and Roper and RealPage sought to eliminate the human aspect from the pricing equation.[15]

83.     RealPage's first test site with Yieldstar proved to be wildly successful, as its first client began to raise rents and earn higher profit despite having high turnover.

> What we found was that driving our turnover rate up actually captured additional revenue . . . while turnover expenses increased by $2.5 million, revenue increased by $12.5 million. Keeping the heads in the beds above all else is not always the best strategy.[16]

84.     Accordingly, RealPage's entry into the industry was seen as a huge boon to the bottom line for property managers.

85.     As early as 2007, the industry began taking note of the success of RealPage and its biggest competitor LRO, at the time noting that "[RealPage and LRO] lead the pack."[17]

86.     When discussing the rise of pricing software, one real estate executive told the industry publication Yield Pro noted that "a rising tide lifts all boats."[18] According to Roper and other executives, "One of the greatest threats to a landlord's profit, was other firms setting rents too low at nearby properties. . . If you have idiots undervaluing, it costs the whole system."[19]

---

[14] *Id.*

[15] *See* Note 1, *supra.*

[16] *See* Note 13, *supra.*

[17] Wendy Broffman, *The Bottom Line on Revenue Management*, YieldPRO (April 1, 2007). Available at: https://yieldpro.com/2007/04/the-bottom-line-on-revenue-management/

[18] *Id.*

[19] See Note 1, *supra.*

19

87.     RealPage happily pushed these aspects of its Yieldstar software, including testimonials from executives on its website.

"The beauty of YieldStar is that it pushes you to go places that you wouldn't have gone if you weren't using it."[20]

"We over-achieved our market by 4.3%, and earned a profit of $1.4 million. . . Yieldstar has unparalleled access to market data that allows us to get insight into all of our markets and get insight into . . . what everyone in the industry is doing and make decisions appropriate on a lot of different fronts."[21]

"There are times you can have a lower percent occupancy, and a higher rent."[22]

88.     Accordingly, sometime around 2016, the industry's use of pricing software began to achieve 'critical mass' through 'data convergence.'[23] As more and more property managers began using pricing software to push the boundaries of what could be charged for higher rent, RealPage received more and more data to fuel its algorithm.

89.     RealPage and participating property managers, thus find themselves in a symbiotic relationship, where the bigger each becomes, so too do the rewards. In this way, Defendants have either tacitly or expressly agreed to not compete on price, and to outsource their pricing decisions to RealPage.

90.     By doing so, RealPage's prices dictated the market conditions, and it was as if RealPage and its clients acted as a single unit setting prices for the entire market.

---

[20] *Id.*

[21] *Yieldstar Revenue Management: Client Outperforms by 4.3%*, RealPage. Available at: https://www.realpage.com/videos/revenue-management-software-review-venterra/

[22] *Yieldstar Revenue Management Optimizes Rent Pricing*, RealPage. Available at: https://www.realpage.com/videos/yieldstar-optimizes-rent-pricing/

[23] *See Note 1, supra*, quoting *What's Revving Revenue Management,* National Apartment Association (September 2016). Available at: https://www.documentcloud.org/documents/23131072-screencapture-naahq-org-news-publications-units-september-2016-article-whats-revving-revenue-management-2021-05-20-11_07_45?responsive=1&title=1)

91. It is reported that at times property companies pushed back on about 10-20% of RealPage's pricing strategies. Phrasing it differently, RealPage's pricing strategies are accepted 80-90% of the time.[24] In some instances, it appears that some leasing agents accept 100% of the recommended prices set by RealPage.

92. Additionally, RealPage makes it difficult for property companies to veer from the course. RealPage's 'Revenue Management Advisors' police the property companies, and oversee their pricing strategies. Leasing agents must provide justifications to reduce rent, or to diverge from the pricing strategy.

93. Furthermore, RealPage's software is used to stagger lease renewal dates for vacant properties. Staggering renewal dates this way, avoids temporary periods of oversupply resulting from the natural ebb and flow of the market.[25] This reduces the incentive for property managers to compete with the market, as each participant stands to benefit from this arrangement. Competing for the market share has become nonexistent as a result when these oversupply periods have virtually disappeared.

94. As a result of RealPage's aggressive pricing, rents have consistently gone up across the country for the past decade, more than they would have had absent Defendants' unlawful activities.

95. As one RealPage executive described it, "I think [Yieldstar is] driving it, quite honestly. . . As a property manager, very few of us would be willing to actually raise rents double digits within a single month by doing it manually."[26]

---

[24] *See Note 1, supra.*
[25] *Outperform in a Down* Market, RealPage. Available at: https://www.realpage.com/ebooks/outperform-in-a-down-market/.
[26] *See* Note 1, *supra.*

21

*Plus Factors*

96.     The market for multifamily residential real estate is characterized by multiple factors, or 'plus factors' that render the industry susceptible to unlawful activity, such that the formation, maintenance, and efficacy of a cartel is more likely than not.

97.     These plus factors include: (1) high barriers to entry, (2) high barriers to exit, (3) market concentration, (4) inelastic consumer demand, (5) relative fungibility of residential real estate leases, (6) exchanges of competitively sensitive information among horizontal competitors, and (7) numerous opportunities to collude at trade associations and RealPage functions.

98.     First, RealPage's participating property companies, directly, and via RealPage's algorithm, share sensitive financial information with each other. Previously, Defendants had no unilateral interest in disadvantaging themselves relative to their competitors by giving away confidential information. Despite being competitors, Defendants now share pricing strategies as well as adhere to the same pricing principles as set by RealPage. RealPage claims that Yieldstar prevents anti-collusive behavior. In actuality, RealPage has provided numerous opportunities for property managers to collude. RealPage holds frequent events and conferences for property companies to communicate and collude. Moreover, RealPage operates a website called the Idea Exchange, whereby property companies at any time can discuss industry secrets with competitors, and provide ideas and requests to RealPage for future product releases.[27] Property managers can also join committees to "make new contacts in the industry, get products answered, and learn how to more effectively use their system."[28]

---

[27] *Best Practices for the Idea Exchange*, RealPage. Available at: https://www.realpage.com/user-group/best-practices/
[28] The RealPage User Group, available at: realpage.com/user-group/

99.     Former Federal Trade Commissioner, Maureen K. Ohlhausen discussed the potential of illegal price fixing via pricing algorithms back in 2017. [29]

> Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either.

> If conduct was unlawful before, using an algorithm to effectuate it will not magically transform it into lawful behavior.

> Imagine a group of competitors sub-contracting their pricing decisions to a common, outside agent that provides algorithmic pricing services. Each firm communicates its pricing strategy to the vendor, and the vendor then programs its algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has confidential price strategy information from multiple competitors, it can program its algorithm to maximize industry-wide pricing. In effect, the firms themselves don't directly share their pricing strategies, but that information still ends up in common hands, and that shared information is then used to maximize market-wide prices.

100.     This sharing of information is a super plus factor. As described by legal scholars, "In an industry where the product made by different firms is largely homogenous, a shift in the incentives of sales forces across firms in an industry to "price before volume" leads to the strong inference of explicit collusion, namely, it is a super plus factor."[30] This principle is clearly demonstrated by the multifamily residential real estate industry. An industry once dominated by competitors seeking to put 'heads in beds' has now turned increasingly friendly to one another. As indicated by real estate executives, what matters now is price.[31]

101.     Second, multifamily residential real estate property owners and operators face significant barriers to entry such as high acquisition and maintenance costs. Small multifamily

---

[29] *See* Note 4, *supra.*
[30] William E. Kovacic, Robert C. Marshall, Leslie M. Marx, and Halbert L. White, "Plus Factors and Agreement in Antitrust Law," Michigan Law Review, Vol. 110:393 (2011).
[31] *See* Note 15, *supra.*

residential units can cost millions of dollars, not to mention the huge complexes that only the largest corporations can afford to run. Instances like these demonstrate the difficulty for new competitors to enter the market.

102. Third, the average consumer oftentimes cannot afford alternatives to multifamily residential real estate units, if any such exist. Consumers do not have the same access to capital as do large commercial entities, and can sometimes be forced to choose to lease a multifamily residential unit. There is no reasonable or realistic alternative for the average individual.

103. Fourth, multifamily residential real estate properties are especially fungible, especially when comparing different categories of properties when controlling for characteristics of properties, such as the number of bedrooms, bathrooms, location, etc. Defendants have explained that RealPage's pricing looks at similar competitor properties as it relates to competitor apartment pricing. Accordingly, it is possible for an algorithm to substitute, categorize, and price individual apartment units as if they were commodities.

104. Fifth, RealPage's and the Defendants, directly and indirectly, share proprietary and ostensibly competitive sensitive information among one another.  RealPage price setting and lease renewal staggering services.  It also collects non-public data on multifamily residential real estate properties, while creating benchmarking reports that allow for real time, immediate comparisons of a property manager's performance on occupancy and price for similar rental property classes. Advertised rates for residential real estate leases typically diverge from the actual rates.  Hence, this function is not be recreated using any public, non-competitively sensitive sources.

105. Sixth, RealPage and Defendants have had ample opportunities to collude. Defendants and property management firms have been involved in the development of RealPage's

pricing software from its inception enabling them to coordinate supply levels and avoid competition.

106.    RealPage and Defendants and management firms routinely interact privately with one another, sharing information, and collaborating on the development of its price setting mechanisms. A private "RealPage User Group Forum" – an association of some thousand participating property management companies, aims "to improve communications between RealPage and the user [Lessor] community," while "promot[ing] communication between users [Lessors]" themselves, as well as providing comments on proposed changes that RealPage is considering implementing to its software offerings.

107.    RealPage organizes in-person events promoting collaboration among participating Defendants, inviting suggestions for RealPage's software offerings with the explicit instruction to consider "the mutual benefit of all users." Such conferences have been held in Las Vegas, NV, Nashville, TN, Orlando, FL, and virtually during the Covid-19 pandemic.

108.    RealPage has also invited Defendants and property companies to attend periodic "summits" to discuss RealPage's pricing software with RealPage and with one another.

109.    Industry trade associations offer RealPage and participating Defendants additional opportunities to conspire, including, the National Multifamily Housing Council ("NMHC"), which "tracks market conditions through NMHC member surveys as well as data from data provider partners," to provide "industry benchmarks" on topics like "In Place Rent Per Square Foot," "Rent Change – New Leases," and "Rent Change – Renewals." Numerous additional national and regional trade associations (or their local chapters) serve as conduits of the cartel, enabling RealPage and Defendants to further their cartel's goals.

25

110.     National industry trade associations include: (1) Institute of Real Estate Management, (2) National Apartment Association, (3) National Association of Residential Property Managers, (4) Pension and Real Estate Association, and (5) Urban Land Institute.

111.     Regional associations and chapters include: (1) Apartment Association of Greater Dallas, (2) Apartment Association of Greater Orlando, (3) Apartment Association of Greater Los Angeles, (4) Apartment Association of Metro Denver, (5) Apartment Association of Orange County, (6) Apartment Association of Southeast Texas, (7) Apartment Owners Association of California, Inc., (8) Arizona Multihousing Association, (9) Atlanta Apartment Association, (10) Austin Apartment Association, (11) Bay Area Apartment Association, (12) Berkeley Property Owners Association, (13) California Apartment Association, (14) California Business Properties Association, (15) California Landlord Association, (16) California Rental Housing Association, (17) Chicagoland Apartment Association, (18) Colorado Apartment Association, (19) East Bay Rental Housing Association, (20) Florida Apartment Association, (21) Georgia Apartment Association, (22) Houston Apartment Association, (23) Illinois Rental Property Owners Association, (24) Maryland Multi-Housing Association, (25) Massachusetts Apartment Association, (26) Miami Dade Real Estate Investors Association, (27) Mid-Atlantic Real Estate Investors Association, (28) Nevada State Apartment Association, (29) Nor Cal Rental Property Association, (30) North Central Florida Apartment Association, (31) Northwest Florida Apartment Association, (32) Oregon Apartment Association, (33) Oregon Rental Housing Association, (34) Portland Area Rental Owners Association, (35) Rental Housing Association of Washington, (36) San Antonio Apartment Association, (37) San Francisco Apartment Association, (38) South Coast Apartment Association, (39) South East Florida Apartment Association, (40) Southern California Rental Housing Association, (41) Southwest Florida Apartment Association, (42) Texas

26

Apartment Association, (43) Washington Multi-Family Housing Association, and (44) Washington Landlord Association.

112. Finally, RealPage provides property management companies, including the Defendants, with a motive to conspire by advertising revenue increases that would otherwise not be possible, thereby allowing property managers, to increase their revenue by as much as 14% in some instances.[32]

## IV. CLASS ACTION ALLEGATIONS

113. Plaintiff brings this action as a class action pursuant to Rule 23 *et seq.* of the Federal Rules of Civil Procedure on behalf of the Class.

114. Plaintiff proposes the following Class Definition:

**All persons and entities in the United States and its territories that are direct purchasers of multifamily residential real estate leases from a Lessor participating in RealPage's pricing software and/or lease renewal staggering software programs, or from a division, subsidiary, predecessor, agent, or affiliate of such Lessor, at any time during the period of January 1, 2016 until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.**

115. Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, members, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members and staff.

---

[32] *South Region Sees Most Pandemic Era Revenue Growth*, RealPage. Available at:
https://www.realpage.com/analytics/south-region-sees-most-pandemic-era-revenue-growth/

116.    Plaintiff reserves the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

117.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

118.    Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These questions include but are not limited to:

a.      Whether Defendants have entered into a formal or informal agreement, conspiracy, or common understanding to artificially inflate the price and/or artificially suppress the supply of multifamily residential real estate units from competitive levels;

b.      If Defendants entered into a formal or informal agreement, conspiracy, or common understanding, whether that conduct violates Section 1 of the Sherman Act under the '*per se'*, 'quick look', or 'rule of reason' modes of analysis.

c.      If Defendants entered into a formal or informal agreement, conspiracy, or common understanding, whether such conduct has in fact artificially inflated the price and/or artificially suppressed the supply of multifamily residential real estate units from competitive levels;

d.      The proper measure of damages; and

e.      The appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

119.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

120.    Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff will fairly and adequately represent and protect the interests of the Class Members. No Plaintiff has a disabling conflict of interest with any other Member of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class, and the infringement of rights and the damages they have suffered

28

are typical of other Class Members. Plaintiff also has retained counsel experienced in complex class action and antitrust litigation, and they intend to prosecute this action vigorously.

121.    As provided under Fed. R. Civ. P. 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct in relation to the Class and making final injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly, and Plaintiff challenges these policies by reference to Defendants' conduct with respect to the Class as a whole.

122.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

123.    Consistent with Fed. R. Civ. P. 23(b)(3), class treatment is superior to all other available methods for the fair and efficient adjudication of this controversy. Among other things, it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Moreover, class action treatment will permit the adjudication of relatively modest claims by Class Members who could not individually afford to litigate a complex claim against large corporations such as Defendants. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

124.    Particular issues, such as questions related to Defendants' liability, are also appropriate for certification under Fed. R. Civ. P. 23(c)(4) because the resolution of such common issues would materially advance the resolution of this matter and the parties' interests therein.

125.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1), in that the prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. Prosecution of separate actions by Class Members also would create the risk of adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

## COUNT I

### AGREEMENT IN RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

126.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

127.    Defendants have formed a cartel to artificially inflate the price of, decrease and disguise the supply of, and output of multifamily residential real estate leases from competitive levels.

128.    The Defendants' cartel has caused the Class to suffer overcharge damages.

129.    There are no precompetitive justifications for the Defendants' cartel, and any proffered justifications, to the extent legitimate, could be achieved by less restrictive means.

30

130. The Defendants' cartel is unlawful under a per se mode of analysis. In the alternative, the Defendants' cartel is unlawful under either a quick look or rule of reason mode of analysis.

## COUNT II

**VIOLATION OF SECTION I OF THE SHERMAN ACT FOR CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION**

131. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

132. Beginning at a time currently unknown to Plaintiff and members of the Class, Defendants, and their co-conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations in violation of the Sherman Act.

133. Defendants' acts in furtherance of their conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

134. Defendants' anticompetitive acts have and had a direct, substantial, and foreseeable effect on interstate commerce in the United States.

135. The exchange of information by Defendants consisted of detailed, competitively sensitive, and non-public information about pricing plans and strategies.

136. Defendants' regular information exchanges through RealPage show concerted action between horizontal competitors in the multifamily residential real estate market.

137. Defendants' pricing algorithm encouraged Defendants to adhere to a common pricing system that would artificially inflate prices, while artificially suppressing output.

31

138.     Defendants' actions have caused rental prices throughout the country to substantially increase, directly harming the average consumer.

139.     As a result of Defendants' unlawful actions, Plaintiff and class members have been forced to pay inflated, supracompetitive prices.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all Class Members, request judgment against Defendants and that the Court grant the following:

a.     An Order certifying the Class, as defined herein, and appointing Plaintiff and their counsel to represent the Class;

b.     A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Act under either a *per se*, quick look, or rule of reason mode of analysis.

c.     A judgment enjoining Defendants from engaging in further unlawful conduct.

d.     For an award of reasonable attorneys' fees, costs, and litigation expenses, as allowed by law;

e.     For an award of damages, including actual, statutory, consequential, punitive, and nominal damages, as allowed by law in an amount to be determined;

f.     An award of pre- and post-judgment interest on all amounts awarded; and

g.     Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 12, 2023                    **STRANCH, JENNINGS & GARVEY, PLLC**

                        By:     _/s/ J. Gerard Stranch IV_____
                                J. Gerard Stranch IV (BPR #23045)
                                223 Rosa L. Parks Avenue, Ste. 200
                                Nashville, TN 37203
                                Tel: (615) 254-8801
                                Fax: (615) 255-5419
                                gstranch@stranchlaw.com

                                **BARRACK, RODOS & BACINE**

                                Gerald J. Rodos*
                                Jeffrey A. Barrack*
                                Andrew J. Heo*
                                2001 Market Street, Ste. 3300
                                Philadelphia, PA 19103
                                Tel.: (215) 963-0600
                                Fax: (215) 963-0838
                                grodos@barrack.com
                                jbarrack@barrack.com
                                aheo@barrack.com

                                Stephen R. Basser*
                                Sam M. Ward*
                                600 West Broadway, Ste. 900
                                San Diego California, CA 92101
                                Tel.: (619) 230-0800
                                Fax: (619) 230-1874
                                sbasser@barrack.com
                                sward@barrack.com

                                **STECKLER WAYNE & LOVE PLLC**

                                Bruce W. Steckler*
                                12720 Hillcrest Road, Ste. 1045
                                Dallas, TX 75230
                                Tel.: 972-387-4040
                                Fax: 972-387-4041
                                bruce@swclaw.com

33

OF COUNSEL:

Paul D. Stickney*
12720 Hillcrest Road, Ste. 1045
Dallas, TX 75230
Tel.: 972-387-4040
judgestick@gmail.com

*Attorneys for Plaintiff and the Proposed Class*

*pro hac vice application to be filed*